IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

WILMINGTON TRUST, N.A.,
as Securities Intermediary,

        Plaintiff,

v.

HERMAN SEGAL,

        Defendant.

Case No. 1:21-cv-01540

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

Plaintiff, Wilmington Trust, N.A., as Securities Intermediary (in such capacity "Securities Intermediary" or "Plaintiff"),[1] through its undersigned counsel, sues Herman Segal as follows:

### I.    THE PARTIES

1. Plaintiff is a national banking association with its principal offices in Wilmington, Delaware. Plaintiff is the owner and beneficiary of two life insurance policies issued by John Hancock Life Insurance Company insuring the life of Lilly Segal.

2. Defendant Herman Segal ("Defendant" or "Herman") is the son of the late Lilly Segal ("Mrs. Segal") and, upon information and belief, Herman is a New York resident.

### II.    JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of

---

[1] At all times, Wilmington Trust, N.A. acts solely as the Securities Intermediary for the benefit of Geronta Funding, a Delaware statutory Trust, and does not act in its individual capacity. *See, e.g.*, N.Y. U.C.C. § 8-102(a)(14)(ii).

costs, interest and attorneys' fees.

4. This Court has personal jurisdiction over Defendant because he is a citizen and resident of the state of New York.

5. Venue is also proper under 28 U.S.C. § 1391(b) because Defendant resides in this judicial district and the conduct at issue in this action took place, at least in part, in this district.

### III. FACTUAL BACKGROUND

6. This case arises from Defendant's intentional efforts to interfere with Securities Intermediary's contractual rights under two life insurance policies insuring the life of Defendant's mother.

7. In particular, as explained in more detail below, Defendant—who has a well-documented history of dishonesty and concealment in multiple facets of his life—took *affirmative* steps to conceal the death of his mother with the sole purpose of depriving Plaintiff of the death benefits it is rightfully owed under those life insurance policies in order to put him in a position to demand money from Plaintiff.

8. Securities Intermediary's rights are dependent upon its ability to demonstrate the fact and date of the death of the insured.

9. As a result of Defendant's actions—including, among other things, his misrepresenting his mother's birthdate and social security number on her death certificate and hiding the fact of her death—Defendant has prevented Securities Intermediary from recovering $19 million it is legally entitled to under the Policies.

    A.    **The Life Insurance Policies Insuring the Life of Lilly Segal**

10. This action involves two life insurance policies issued by John Hancock Life Insurance Company insuring the life of Mrs. Segal, Policy No. 9397600 ("Policy 1," *see* ECF 1-

1, hereinafter Exhibit A) and Policy No. 93972826 ("Policy 2," *see* ECF 1-2, hereinafter Exhibit B), both of which were issued on March 5, 2008 (collectively, the "Policies") with a face amount of $9,500,000 each.

11.     At the time the Policies were issued and until their initial purchase by a third party in March 2012, the beneficiary of Policy 1 was The Lilly Segal Family Trust #1 dated January 18, 2008 and the beneficiary of Policy 2 was The Lilly Segal Family Trust #2 dated January 18, 2008 (collectively, the "Trusts").  ECF 14-3 (hereinafter Exhibit C).

12.     Securities Intermediary acquired the Policies from EEA Life Settlements on August 4, 2016 (over 8 years after their issuance), and became the owner and beneficiary of the Policies. ECF 14-5.

13.     Pursuant to the terms of Policy 1, Securities Intermediary is entitled to a death benefit payment of $9,500,000 for Policy 1 upon the death of Mrs. Segal.  Exhibit A.

14.     Pursuant to terms of Policy 2, Securities Intermediary is entitled to a death benefit payment of $9,500,000 for Policy 2 upon the death of Mrs. Segal.  Exhibit B.

15.     Under the Policies, the death benefits will be paid to Securities Intermediary as the beneficiary of the Policies upon submission of proof of death of the insured, Mrs. Segal.

16.     On March 26, 2012, Mrs. Segal executed a Death Certificate Authorization Agreement directing her personal representative, family members or any other person with responsibility for her affairs at the time of her death to obtain and provide an original death certificates and/or any other document(s) necessary to process a claim for the death benefit owed under the Policies.  *See* Exhibit C. This document authorizes and directs Defendant, as Mrs. Segal's son and next of kin, who arranged for her burial and signed her death certificate, to provide

Securities Intermediary with sufficient documentation to claim the death benefit to which it is entitled.

**B.      Herman Segal's Knowledge and Involvement with the Policies**

17.     Defendant was a beneficiary of the Trusts during the time period that the Policies were owned by the Trusts.  Exhibit C.

18.     Defendant was aware of the existence of the Policies and the terms contained therein.

19.     On March 26, 2012, Defendant, in connection with a sale of the Policies and in his capacity as beneficiary of the Trusts, signed a document acknowledging that the Trusts and the beneficiaries of the Trusts had agreed to sell the beneficial interest in the Policies to a third party (EEA Life Settlements) and that the Trusts (and beneficiaries) would have no further interest in the Policies.  *See* ECF 14-4 (hereinafter Exhibit D).

20.     On information and belief, as a beneficiary of the Trusts, Defendant benefitted financially from the sale of the beneficial interests of the Policies.

21.     Defendant has known that Plaintiff is the current owner and beneficiary of the Policies, entitled to receive the death benefits under the Policies upon Mrs. Segal's death.

**C.      Herman Segal's Deliberate Efforts to Conceal his Mother's Death in Order to Prevent Plaintiff from Recovering the Death Benefits Due under the Policies.**

22.     Lilly Segal passed away at 12:05 am on November 7, 2018, at her son, Defendant Herman Segal's home.  . ECF 14-6 (hereinafter Exhibit E); ECF 14-7 (hereinafter Exhibit F).

23.     Notwithstanding the express instruction from Mrs. Segal that her death certificate be provided to the current owner of the Policies at the time of her death in order to facilitate payment of the death benefits, Defendant took *deliberate and affirmative actions* to conceal Mrs. Segal's death.

4

24. In particular, Defendant—the only surviving child of Mrs. Segal—took steps to conceal Mrs. Segal's death from public record, including by directing or facilitating a name change for Mrs. Segal prior to her death, listing that name on the death certificate with no reference to "Lilly Segal," utilizing a false social security number and birthdate on both the name change submission and the death certificate, and using an alternate name for himself in submitting the information for the death certificate.

25. In particular, prior to Mrs. Segal's death, she (purportedly) submitted a name change form to the Superior Court of New Jersey to change her name to Sprinta Berger. ECF 14-10 (hereinafter Exhibit G). The form submitted to the Court lists her name as Lilly Segal, born January 14, 1924, rather than her actual birthdate of March 26, 1926. *Id.* The form states that she was born in Czech Republic, daughter of Sprinta Berger and Hershel Berkovits (apparent aliases of Shrpintza Berger and Tzvi Berkovitcz listed on the death certificate). *Id.* The form lists aliases of Lilly Segal as: Lenka, Leah, Lily Berkovitz, and Lilly Segal. *Id.* Tellingly, Lenka Segal is the name on Mrs. Segal's Naturalization Certificate. ECF 14-11 (hereinafter Exhibit H).[2]

26. Even though the name change form purports to have been submitted by Lilly Segal, the phone number provided is that of Herman Segal, and the false birthdate and social security number utilized on the form are the same false numbers provided by Herman when submitting her information to the funeral home following her death. Exhibit G.

27. Although the birthdate listed on the name-change form is incorrect, it is clear from the address and other information provided on the form that the Lilly Segal who changed her name to Sprinta Berger is in fact the insured under the Policies. The phone number listed on the form is

---

[2] The Naturalization Certificate lists Mrs. Segal's correct birthdate — March 26, 1926. *Id.*

Herman (a/k/a Herschel) Segal's phone number. *See id.*; *see also* Exhibit F at 4. The form also represents that the name change was submitted because Mrs. Segal sought to assume her mother's name to honor her memory. Exhibit G.[3]

28. On April 25, 2017, Judge Kevin M. Shanahan of the Superior Court of New Jersey ordered the name change applied for, and Lilly Segal legally became Sprinta Berger. ECF 14-12 (hereinafter Exhibit I).

29. The death certificate for Lilly Segal (the insured) was issued in the name of Sprinta Berger. Exhibit E. The physician who certified the death, Eli Inzlicht-Sprei, was Lilly Segal's physician. ECF 14-8 (hereinafter Exhibit J), ¶ 3; ECF 14-9 (hereinafter Exhibit K). Specifically, Dr. Inzlicht-Sprei had been Lilly Segal's treating physician since 2009. Exhibit L, ¶ 3.

30. Dr. Inzlicht-Sprei was called by Herman Segal (who he states also goes by Herschel) to come to Mr. Segal's home on November 7, 2018 to attend to Lilly Segal. Exhibit J, ¶ 4. When he arrived, he confirmed that Lilly Segal was deceased. *Id.*

31. Dr. Inzlicht-Sprei issued the death certificate in the name of Sprinta Berger because Herman Segal advised the doctor that Lilly Segal had legally changed her name to Sprinta Berger. Exhibit J, ¶ 5.

32. The death certificate lists the same incorrect social security number for Lilly Segal a/k/a Sprinta Berger that was used on the name change form. Exhibit E. In particular, it includes a social security number that is registered to an individual who is *not* deceased, but is currently living in Florida. *See* ECF 14-13 (hereinafter Exhibit L).

---

[3] The death certificate for Sprinta Berger (aka Lilly Segal) notes that her mother's name was Shprintza Berger. Exhibit D.

33. The false social security number provided for Lilly Segal a/k/a Sprinta Berger is nearly the same as Lilly Segal's actual social security number (the number she used when applying for the Policies), with only two numbers changed. *Compare* Exhibit E *with* ECF 14-14 (hereinafter Exhibit M).[4]

34. The slightly modified social security number was provided to Jewish Funeral Services of Brooklyn by "Herschel Siegal," whom the funeral home lists as the "son" of the deceased. *See* Exhibit F, ¶ 4. The address provided for Herschel is the residence formerly owned by Herman Segal (Mrs. Segal's actual son). *Id.*; *see also* ECF 14-15 (hereinafter Exhibit N); ECF 14-16 (hereinafter Exhibit O).

35. The funeral home expenses associated with the transfer and burial of Lilly Segal's remains were paid by check from an estate for which Herman Segal is the executor - as is evident on the face of that check itself:



Exhibit G at 1, 9.

---

[4] In particular, Lilly Segal's actual social security number (with all numbers that were unchanged by Herman Segal redacted for purpose of public filing) is XXX-X4-XXX2. The social security number provided by Herman Segal on Lilly's Segal's death certificate (with all numbers that were unchanged redacted for purpose of public filing is XXX-X6-XXX3).

7

36. Both the death certificate and the burial receipt, signed by the funeral director, confirm that Sprinta Berger a/k/a Lilly Segal's body was transferred to Beth David Cemetery in Elmont, New York. Exhibit E; Exhibit F at 5. In particular, James Donofrio, the Director of Jewish Funeral Services of Brooklyn went in person to Herman Segal's residence (located at 4115 Quentin Road, Brooklyn, New York) to retrieve Herman's mother's body after Herman Segal called an employee of the funeral home. Exhibit F, ¶¶ 3– 4.

37. Mrs. Segal's body was transferred by the funeral home to Beth David Cemetery, and that Jewish Funeral Services of Brooklyn coordinated the interment of the body Burial Grounds of Yeshiva Rabbi Chaim Berlin, Map 1228, Section 1, Block 5, Row D, Grave # 10 in Beth David Cemetery. *Id.* at ¶¶ 6-7; ECF 14-17 (hereinafter Exhibit P). No gravestone, however, has been raised at Sprinta Berger a/k/a Lilly Segal's grave site. *See id.* ¶ 6. And the tag that was affixed by the cemetery to the plastic marker for the grave has been removed. *See id.* 4–7.

38. Although her grave is not marked, the Vice President of the cemetery confirms that the grave immediately beside Lilly Segal's is inscribed with her husband's name (translated from Hebrew, and thus phonetically spelled): Szmul David Ben Y'Israel Halevy Segal (Samuel David son of Israel Halevy Segal). *See id*. at ¶ 4. The grave immediately beside Szmul Segal's is inscribed with their son's name (translated from Hebrew, and thus phonetically spelled): Y'Israel Ben Shmuel David Segal Halevy (Israel son of Samuel David Segal Halevy). *See id.*

39. All of the actions taken by Defendant in obfuscating the fact and date of Lilly Segal's death were taken in an effort to conceal proof of his mother's death and impact the legal rights of insurance policy beneficiaries like, and including, Securities Intermediary. Specifically, Defendant wanted to financially profit from his mother's death. In fact, after her death, Herman

8

Segal was approaching owners of policies on the life of his mother and offering to provide information regarding her death and death certificate in exchange for a substantial cash payment.

**D.      Herman Segal's History of Dishonesty**

40.     Defendant's actions in attempting to conceal his mother's death are not surprising given his well-documented history of fraudulent and dishonest conduct. It is clear from the context of Defendant's history of fraud that his obfuscation of the facts of his mother's death were calculated to impact and undermine Securities Intermediary's rights, and the rights of similarly situated life insurance beneficiaries.

41.     For example, on July 9, 2015, Defendant executed a sworn affidavit, which was filed with the Supreme Court of the State of New York, Kings County, wherein Defendant admitted that he took out a loan on his mother's home, by defrauding Mrs. Segal into signing a loan document to mortgage her home without her knowledge. ECF 1-5 (hereinafter Exhibit Q).

42.     In the affidavit, Defendant further acknowledged that when the lender was attempting to foreclose on the fraudulent loan, Defendant forged Mrs. Segal's signature on an affidavit to be filed with the Court. *See* Exhibit Q. Defendant noted that at time of these actions, in 2015, his mother, Mrs. Segal, was already in poor health and had required a 24 hour/day home health attendant since 2009.

43.     In the same affidavit, Defendant admitted that he also forged his wife's signature in order to notarize the fraudulent affidavit. *Id.*

44.     In addition, in an order issued in a bankruptcy proceeding filed on behalf of Defendant—which Defendant later sought to have dismissed after admitting it was only filed to halt a foreclosure sale—a judge from the United States Bankruptcy Court for the Eastern District of New York found that Defendant took steps to conceal information from the Court and the

Bankruptcy Trustee. In particular, the Court found that Defendant "operated in bad faith"; "refuse[d] to testify or produce documents"; "inconsistent[ly]" invoked the Fifth Amendment in refusing to provide information; "refus[ed] to cooperate with the Trustee and [was] reticen[t] to make full disclosures to the Court"; and that Defendant's assurances to the Court were "not credible." *In re Segal*, Case No. 13-bk-45519, United States Bankruptcy Court, Eastern Distrcit of New York, ECF 188, attached as Exhibit R.

45. In that same action, the Court issued a separate order requiring Defendant to turn over all of his electronic devices for imaging after it found that Defendant "refused to obey" Court Orders requiring to turn over information to the bankruptcy trustee and held Defendant's actions were "improper and unjustified." *Id.* at ECF 260, attached as Exhibit S.

46. Most recently, on December 2, 2020, the United States filed a criminal indictment against Defendant for concealing revenue from the Internal Revenue Service, in part by using nominee bank accounts and check cashing stores to hide revenue from the United States Government and avoid paying taxes. *See United States v. Segal*, Case No. 1:20-cr-00551-MKB, Eastern District of New York, ECF 1, attached as Exhibit T.

47. Notably, Defendant is a law school graduate who was a member of the State of New York bar until he was disbarred in 1990 after being convicted of two counts of conspiracy to commit murder for attempting to arrange the murder of his sister-in-law and her father in retaliation for the death of his brother. ECF 1-9 (hereinafter Exhibit U).

**E.      John Hancock Life Insurance Company's Failure to Pay the Claims on the Policies**

48. Upon learning of the passing of Lilly Segal, Securities Intermediary submitted a claim to John Hancock Life Insurance Company for payment of the death benefits. *See* ECF 14-18 (hereinafter Exhibit V); ECF 14-19 (hereinafter Exhibit W).

10

49. Under the Policies, John Hancock is legally obligated to pay the death benefits to Securities Intermediary "upon receipt of due proof of death of the Life Insured." Exhibit A; Exhibit B.

50. Securities Intermediary has submitted indisputable proof of the death of Lilly Segal to John Hancock in the claim submission and multiple correspondence since Lilly Segal's passing. Exhibit V; Exhibit W. Specifically, though not exclusively, Securities Intermediary has provided John Hancock with a copy of the fraudulently falsified death certificate issued to reflect the death of Sprinta Berger, copies of the documentation underlying Lilly Segal's name change to Sprinta Berger, the affidavit of the physician who declared the death, and the affidavits of the funeral director and cemetery representative reflecting the transport and interment of Mrs. Segal's remains.

51. Notwithstanding having received clear proof of death (thus satisfying the prerequisite to payment under the Policies), John Hancock has refused to pay the death benefits owed under the Policies and, in doing so, has breached the Policies.

52. John Hancock's stated justification for breaching the agreement is that it has not received a death certificate for Lilly Segal containing her correct birthdate and social security number (notwithstanding that the Policies contain no such requirement). Defendant's actions have made it impossible to satisfy that request.

53. As a result, Securities Intermediary, on behalf of its customer, has been harmed and rendered unable to receive payment of the death benefits to which it is lawfully entitled.

### IV. CLAIMS FOR RELIEF

### COUNT I – TORTIOUS INTERFERENCE

54. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 53 as if fully set forth herein.

55. Plaintiff is the owner and beneficiary of the Policies.

56. Defendant has known that Plaintiff is the owner and beneficiary of the Policies, and has had notice of the terms of the Policies.

57. Defendant intentionally and unjustifiably interfered with Plaintiff's rights under the Policies, causing John Hancock to breach its obligation to pay the death benefit to Plaintiff by taking affirmative steps to conceal his mother's death in an effort to prevent the death benefits from being paid out for the Policies.

58. For example, prior to the death of his mother, Herman Segal helped facilitate a name change for his mother in which she would no longer be legally known as Lilly Segal (the name under which all of the life insurance policies on her life were issued). In the name change form, Herman Segal provided a false birthdate and social security number for his mother. Specifically, he changed two of the digits in her social security number (assuming the social security number of another individual who is still living) so it would not match the number legally registered to Lilly Segal.

59. Then, after Lilly Segal's death, Defendant provided the same false information to the funeral home (including the same false social security number–generated by switching out two of the digits in Lilly Segal's social security number), which information was then utilized on the official death certificate.

60. The repeated, apparently intentional error in Lilly Segal's social security number and the discrepancy between the birth dates used by Defendant have resulted in John Hancock's nonpayment, to date, of Plaintiff's claim.

61. As a result of Defendant's actions, Plaintiff has not received the death benefits under the Policies to which Plaintiff is entitled in its capacity as Securities Intermediary. In

particular, John Hancock has refused to pay the death benefits owed under the Policies, notwithstanding its clear contractual obligation to do so. Consequently, John Hancock (as a result of Defendant's conduct) has breached its obligations under the Policies.

62. Rather than comply with the Policies, John Hancock has insisted upon receipt of the death certificate for Lilly Segal containing her correct birthdate and social security number, suggesting this is requirement for its performance (i.e., payment of the death benefits) under the Policies. Defendant's actions have made compliance with this request impossible.

63. Thus, Defendant's actions have not only caused John Hancock to breach its obligations to pay death benefits due to Plaintiff under the Policies, but also have rendered Plaintiff's performance in compliance with John Hancock's interpretation of the Policies' requirements impossible.

64. As a direct result of Defendant's actions, Securities Intermediary, on behalf of its customer, has been damaged in the amount of $19 million in death benefits that have been withheld from it and which it should have received shortly after Lilly Segal passed away on November 7, 2018.

## COUNT II – DECLARATORY JUDGMENT

65. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

66. Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201(a) because the controversy concerns the legal rights and obligations of the parties and the issues raised are sufficiently definite and concrete as to allow a conclusive judgment.

13

67. An actual controversy has arisen and a real dispute exists with respect to the fact and date of death of Mrs. Segal, and Securities Intermediary's legal rights as defined by those facts, generated by the intentional conduct undertaken by Defendant.

68. Declaratory relief is necessary because Plaintiff, in its capacity as Securities Intermediary, will suffer hardship if judicial consideration is withheld. Among other things, Plaintiff has not received the death benefits it is owed under the Policies. As a result of Defendant's actions, without such declaratory relief, Plaintiff will not be able to recover those death benefits.

69. Plaintiff therefore seeks a declaration that:

   a. Lilly Segal, Defendant's mother (whose name was legally changed to Sprinta Berger shortly before her death), passed away on November 7, 2018 and was buried on November 7, 2018 in Beth David Cemetery in Brooklyn, New York next to the grave sites of her deceased son and husband.

   b. Lilly Segal, Defendant's mother (whose name was legally changed to Sprinta Berger shortly before her death), passed away on November 7, 2018 and was buried on November 7, 2018 in Beth David Cemetery in Brooklyn, New York next to the grave sites of her deceased son and husband;

   c. Defendant took deliberate actions to conceal his mother's death, including providing false identifying information on both her death certificate and in the form he used to facilitate a name change for his mother prior to her death;

   d. For example, Defendant caused the social security number on the death certificate to appear as "XXX-XX-5373" when it should have listed "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," the correct number as indicated on Lilly Segal's social security card. In addition,

       Defendant caused an incorrect birthdate to appear on the death certificate instead of Lilly Segal's actual birthdate of March 26, 1926, as evidenced and indicated on her naturalization certificate and driver's license.

e.    As a result of Defendant's actions, the identifying information (i.e., the social security number and birthdate) contained on the death certificate of Sprinta Berger (aka Lilly Segal) is incorrect.

f.    With his actions, Defendant intended to, among other things, obstruct and interfere with Securities Intermediary's right to collect the death benefits on two life insurance policies issued on the life of Defendant's mother.

g.    Defendant's actions have prevented Plaintiff from collecting the death benefits it is owed under the Policies.

## VI. JURY DEMAND

70.    Plaintiff demands a jury trial.

**WHEREFORE** Plaintiff respectfully requests the Court to enter judgment in its favor, against Defendant, for (1) all damages suffered as a result of Defendant's unlawful actions, which could exceed $19,000,000.00, (2) prejudgment interest, (3) attorneys' fees and costs and expenses associated with this litigation, and (4) every other relief the Court deems just and proper under the law. Plaintiff also respectfully request a declaratory judgment consistent with paragraph 65 above.

Dated: May 26, 2022                              Respectfully submitted,

                                                       **HOLLAND & KNIGHT LLP**
By: */s/ Katherine A. Skeele*
Katherine A. Skeele
31 West 52nd Street
New York, New York 10019
Email: katherine.skeele@hklaw.com

and

Jesus E. Cuza, *pro hac vice*
Rebecca Canamero, *pro hac vice*
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Email: jesus.cuza@hklaw.com
      rebecca.canamero@hklaw.com

16